David C. Kresin (019858)
ROBAINA & KRESIN PLLC
One East Camelback Road, Suite 710
Phoenix, Arizona 85012
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
dck@robainalaw.com
Attorneys for Plaintiff Melissa Summerson

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Melissa Summerson, Plaintiff, vs. City of Kingman, Defendant. | No. **COMPLAINT** (Jury Trial Demanded) |

Plaintiff Melissa Summerson, by and through her counsel, alleges as follows:

1. Plaintiff Melissa Summerson ("Summerson") is an adult female residing in Kingman, Arizona.

2. Defendant City of Kingman ("the City") is a municipality in Arizona.

3. This action is brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331.

4. In April 1996, Summerson applied for a dispatcher/radio job in the City's Police Department. On her application, she verified that she had not been convicted of a felony in the previous seven years. The application did not ask whether Summerson was associated with any motorcycle clubs, outlaw motorcycle gangs, criminal street gangs, or other individuals who are associated with such organizations.

5. Despite a very thorough background interview, the interview did not inquire as to whether Summerson was associated with any motorcycle clubs, outlaw motorcycle gangs, criminal street gangs, or other individuals who are associated with such organizations.

6. After a thorough background investigation, in June 1996, Summerson began her employment with the City as a Communications Specialist (Dispatcher) in the City's Police Department.

7. At that time, Summerson signed the Oath of Office, swearing or affirming that she "will support the Constitution of the United States and the Constitution of the State of Arizona and its laws: that [she] will bear true faith and allegiance to the same, and defend them against all enemies, foreign and domestic . . . ."

8. Summerson received her only evaluation by the Police Department in April 1997. In that evaluation, Summerson was lauded for her professionalism and integrity: "[Summerson] is the consummate professional in all her dealings, inter and intra agency. She holds her position and responsibility to the Kingman Police Department in high regard. Her veracity, sense of 'fair play' and highly ethical approach to every task she undertakes; is a positive reflection on the Kingman Police and Fire Departments. [Summerson] has always projected a positive, professional and cooperative attitude to all her contacts."

9. In that evaluation, the evaluator acknowledged that "[Summerson's] resolve and strength of character were evident during [a] very trying ordeal" in which "She was the victim of sexual harassment. Her demeanor and composure during this harrowing ordeal was admirable."

10. In summary, the evaluator concluded that "[Summerson] has, in the her [sic] short tenure with the Kingman Police Department, garnered the trust, respect and admiration of supervisors, peers and Officers alike. . . . [Summerson] is a rare find, given todays [sic] labor pool: She is focused, committed, honest, loyal and highly principled. She is destined for great things."

11. In October 1997, Summerson transferred from the Police Department to a Customer Service Representative position in the City's Financial Services Department.

12. In October 1998, Summerson accepted a promotion to Customer Service Officer in the Financial Services Department.

13. In December 1999, Summerson married her current spouse, William Summerson. Former City Manager Roger Swenson, Human Resources Director Jackie Walker and many others from the City attended the wedding. Summerson immediately notified the City of her marriage and her new spouse.

14. In February 2002, Summerson applied for a position as the Human Resources Administrator. The Application for Employment form asked "Have you ever been convicted of a felony within the last five years?" Summerson answered "No."

15. The application did not ask whether Summerson was associated with any motorcycle clubs, outlaw motorcycle gangs, criminal street gangs, or other individuals who are associated with such organizations.

16. In her application, Summerson verified that she understood that she was "required to abide by all rules and regulations of the employer."

17. As part of the application process, she verified she had never been convicted of a crime.

18. In April 2002, Walker offered and Summerson accepted the position of Human Resources Administrator, the second highest position in the City's Human Resources Department.

19. At that time, Summerson signed an Acknowledgement of Electronic Communications and Internet Access Policy, agreeing to abide by the policy and expressing her understanding that all information in the City's information system is the property of the City and is to be used only for authorized purposes.

20. During Summerson's time as the Human Resources Administrator, the Position Description described the Essential Functions of her job to include "Oversee the maintenance of employee master files, and human resources & payroll information systems." Likewise, the position required:"Ability to work with people and develop a trusting working relationship and maintain confidentiality"; "Ability to deal with problems which may be controversial or sensitive in nature and create an atmosphere of

trust and confidentiality in all personnel functions"; and "Ability to maintain confidentiality of employee records and work products."

21. In 2004, Summerson's husband became a member of the Desert Road Riders Motorcycle Club ("DRRMC"), a family motorcycle club made up of businessmen and other individuals in the community.

22. From that point forward, Summerson regularly and openly showed her support for the DRRMC by wearing DRRMC colors and apparel to work and openly discussing her participating in DRRMC events with her co-workers.

23. The Desert Road Riders organized in 1991 in Bullhead City, Arizona and describe themselves as a "circle patch family club" that was "formed to promote good will in the communities of the tri-state area." The club was a charter member of the Arizona Confederation of Motorcycle Clubs ("ACMC").

24. A family motorcycle club is distinct from a "one-percent" club both in its purposes and its apparel. The patches worn by family clubs are a one-piece circle patch, while one-percent clubs wear a three-piece patch with the name across the top piece and the territory across the bottom piece. Members of one-percent clubs also typically wear a "1%" symbol on their apparel, indicating their intent to be outlaws and their choice to be part of the one percent of bikers not committed to society's rules and laws.

25. The DRRMC host and participate in various charitable events. For example, for the past seven years, the DRRMC have hosted the annual "We Care Poker Run" for the purpose of spreading cheer at local retirement homes and collecting donations for the less needy. On December 9, 2012, the DRRMC participated in the ACMC's 1st Annual Statewide Toy Run to collect toys for underprivileged youth.

26. The DRRMC does not knowingly allow convicted felons into their club.

27. Throughout her employment from 1996 to 2006, Summerson regularly earned outstanding performance reviews, raises and promotions. In her annual reviews, Summerson consistently was recognized as appropriately maintaining records and files

within her responsibility, treating other employees with respect, and exercising sound judgment. She was consistently rated excellent for her professional loyalty.

28. On January 18, 2006, Summerson emailed Walker, notifying her of Summerson's intent to end her employment with the City on June 13, 2006.

29. On June 6, 2006, Walker completed the City's Personnel Action form indicating that Summerson resigned effective June 13, 2006 because she was moving out of state to care for her terminally ill father-in-law in Pennsylvania.

30. During Summerson's time living in Pennsylvania, Walker and Summerson kept in contact.

31. Summerson's father-in-law passed away in 2011.

32. In 2011, with full knowledge of Summerson's relationship with her husband and association with the DRRMC, Walker recruited Summerson back to the City to the open position of Human Resources technician.

33. The Human Resources Technician Position Description involved the following duties and qualifications: "Work duties require considerable tact and confidentiality in dealing with the public and City personnel"; "Ability to work with people and develop a trusting working relationship and maintain confidentiality"; "Ability to deal with problems which may be controversial or sensitive in nature and create an atmosphere of trust and confidentiality in all personnel functions"; and "Ability to maintain confidentiality of employee records and work products."

34. Walker concluded that Summerson met all of the requirements of the Human Resources Technician position and offered her the job.

35. In her August 2011 Application for Employment, Summerson verified that she had never been convicted of any crime. The application did not ask whether Summerson was associated with any motorcycle clubs, outlaw motorcycle gangs, criminal street gangs, or other individuals who are associated with such organizations.

36. Summerson returned to the City's employment as the Human Resources technician on September 19, 2011.

37. Upon her return to the City's employment, Summerson again signed a Loyalty Oath swearing or affirming that she "will support the Constitution of the United States and the Constitution of the State of Arizona and its laws: that [she] will bear true faith and allegiance to the same, and defend them against all enemies, foreign and domestic, and that [she] will faithfully and impartially discharge the duties of the office of Human Resources Technician . . ." and she was subjected to a criminal background check.

38. Desert Road Rider President James Snider and his wife helped the Summersons move back to Arizona from Pennsylvania and permitted the Summersons to reside with them for a time while the Summersons found a home in Kingman.

39. When Summerson started back with the City, Walker actually picked up Summerson from the Sniders' residence.

40. In her January 2012 supervisory notes, Walker noted that Summerson "still has confidence of departments."

41. In approximately February 2012, City Manager Jack Kramer, Walker and Chief of Police Robert Devries offered to appoint Summerson as the Interim Communications/Dispatch Director for the Kingman Police Department while the position was being re-developed and the recruitment process was being completed. Summerson declined because she was committed to the human resources profession and was in the midst of studying for her Professional in Human Resources certification examination.

42. In March 2012, Walker gave Summerson a formal performance evaluation, which was approved by Kramer.

43. In the evaluation, Walker lauded Summerson in every respect. For example, regarding Customer Service/Professionalism/Respect, Walker stated: "Melissa has re-assimilated herself well back into the City . . . Melissa's interactions with her co-workers and other internal and external customers is pleasant and professional. Her customer service skills are exceptional."

44. In the evaluation, Walker recognized Summerson's integrity, stating that Summerson met the expectation that she maintain "high standards of honesty and overall integrity [and] can be trusted with confidential information."

45. In June 2012, Summerson completed the long process to obtain her certification as a Professional in Human Resources by passing the certification test.

46. In October 2012, Summerson told another City employee that her husband would not be welcome to ride in a law enforcement-sponsored toy run due to his membership in the DRRMC because the sponsors did not allow "colors" on their run.

47. Subsequently, on October 25, 2012, Police Chief DeVries emailed Captain Scott Wright a copy of a webpage from the ACMC website, indicating the member clubs, associates, and friends/guests/supporters.

48. On November 17, 2012, Summerson, her husband and another member of the DRRMC were pulled over by a Kingman Police Officer Joe Weber for allegedly speeding on their motorcycles while returning from a funeral. After discussing the incident with the three of them, Officer Weber gave them each a warning for excessive speed.

49. Immediately following the incident, Summerson reported to the Human Resources Administrator Linda Semm that the incident had occurred and that she felt that Officer Weber had treated Summerson in a condescending manner when Summerson objected that she had not been driving 50 miles per hour in a 40 mile-per-hour speed zone.

50. Semm told Summerson that if she thought it was necessary, she should contact Officer Weber's supervisor Shay Weber, but Summerson chose not to pursue it.

51. After the November 17, 2012 incident, Seargeant Shay Weber sent a memo to Captain Rusty Cooper regarding the traffic stop and regarding Summerson's association with her husband and the DRRMC and her husband's membership in the DRRMC.

52. Seargeant Weber's memo attached a memo prepared by Officer Joe Weber regarding the November 17, 2012 traffic stop that he initiated. In his memo, Officer Weber noted that Summerson's spouse was courteous and honest.

53. On November 19, 2012, Donald A. Doughty sent a memo to Lieutenant Chastain regarding a 2011 event in which Summerson had identified her friendship with James Snider, the President of the DRRMC and how Snider had assisted with their move back to Arizona and securing their current home—facts already well known to Walker.

54. Doughty's memo went on to describe a June 2012 incident in which he witnessed Summerson selling DRRMC raffle tickets and an October 2012 incident in which he claims Summerson acknowledged that her husband would not ride in the law enforcement sponsored poker run due to his membership in DRRMC.

55. According to Doughty's memo, based on the alleged trend of outlaw motorcycle gang members having their wives, girlfriends, sisters, or other acquaintances obtain employment in positions where sensitive information may be found, Doughty conducted an investigation regarding Summerson at the request of Captain Wright.

56. Doughty checked with the Arizona Department of Public Safety's Access Integrity Unit and determined that Summerson did not have a Terminal Operator Certification and therefore was limited in her access to sensitive information. According to Doughty, Summerson "may, however, have access to background and criminal history information if her position involves the hiring of new employees."

57. In his memo, Doughty acknowledged that "there is no known DPS Policy which restricts the employment of family members related to members of motorcycle and/or street gangs . . . [and he] was advised that in some situations, the activity of employees has been monitored to check for possible privacy violations."

58. In his memo, Doughty noted that Summerson had been seen wearing DRRMC support clothing on the DRRMC website and on the social media site Facebook.

59. In fact, on November 1, 2012, Summerson posted a photo of her and her husband from a bike night event in which Summerson was wearing DRRMC support colors and her husband was wearing his patched vest. That day, Walker commented on the photo: "Love this pic of you two!"

60. At 2:00 p.m. on November 27, 2012, Police Chief DeVries and Walker had a meeting regarding Summerson at the Kingman Police Department.

61. On November 28, 2012, DeVries sent Walker an email indicating that Captain Wright obtained information from the GIITEM Task Force.

62. On December 3, 2012, Walker discussed Summerson with City Attorney Carl Cooper.

63. On December 5, 2012, Cooper sent DeVries, Walker and Wright an email to set up a proposed meeting on December 10 or 11, 2012 to discuss Summerson. All parties agreed to meet on December 10 at 1:00 p.m. and met at that time in Cooper's office.

64. On December 12, 2012, Cooper and Walker exchanged emails about meeting that day to discuss Walker's "employee problem" referring to Summerson. Cooper and Walker met that morning and discussed Summerson.

65. On December 13, 2012, Walker emailed herself draft language stating "You are an associate of a documented Criminal Street Gang, Desert Road Riders a documented support club of the Hell's Angels, under A.R.S. 13-105. As such, your association with Criminal Street Gangs causes us great concern. Because Criminal Street Gangs are known to have strict rules which controls [sic] the behavior and functions of its members, your access to confidential information is in direct conflict with the role of Human Resources."

66. On December 26, 2012, Walker and Kramer signed the City's Personnel Action form, approving the placement of Summerson on paid administrative leave until 5:00 p.m. on December 28, 2012.

67. On December 26, Walker delivered to Summerson a Notice of Intent to Terminate Summerson's employment effective December 28, 2012.

68. In the Notice of Intent to Terminate, Walker did not allege that Summerson had performed her job poorly or that Summerson had engaged in any misconduct.

69. In the Notice of Intent to Terminate, Walker gave as the sole reason for the termination that Summerson was associated with the DRRMC and characterized the DRRMC as a "documented criminal Outlaw Motorcycle Gang (OMG)" and "a support club of the Hell's Angels, which is a criminal street gang as defined by ARS 13-105."

70. Despite that Summerson had provided more than eleven years of exemplary service to the City and over five years in human resources preserving the sensitive information of City employees, including those in law enforcement, legal, dispatch and the judicial system, Walker claimed that Summerson's association with the DRRMC severely jeopardized the security of sensitive employee information impacting the integrity of the Human Resources/Risk Management department and the safety of a large segment of city employees and their families.

71. When Walker delivered the Notice of Intent to Terminate, Summerson asked Walker if Summerson could keep her job if her husband resigned from the DRRMC. Walker said no.

72. Prior to that time, no one from the City had expressed any concern to Summerson regarding the DRRMC or her husband's membership in the club.

73. Prior to that time, no one had expressed any concern regarding Summerson's ability to protect sensitive information or maintain confidentiality.

74. Likewise, no one had interviewed Summerson regarding her or her husband's association with the motorcycle club.

75. Indeed, everyone in the Human Resources department and many employees in the Police Department and other departments knew of Summerson's

association with her husband and with the DRRMC. Many had purchased raffle tickets from Summerson for the DRRMC raffle benefitting various charitable organizations.

76. On December 27, 2012, Summerson attended a six-minute pre-action hearing and provided her rebuttal to the Notice of Intent to Terminate.

77. In her rebuttal, Summerson stated, among other things, that City employees including police officers of all ranks were aware of her association with the DRRMC since 2004.

78. Summerson also rebutted the allegations regarding the nature of the DRRMC as a "support club of the Hell's Angels." She corrected Walker's false statement that the DRRMC were an "Outlaw Motorcycle Gang", which the United States Department of Justice describes as "organizations whose members use their motorcycle clubs as conduits for criminal enterprises."

79. Likewise, Summerson reaffirmed her commitment to honesty, integrity, confidentiality, respect, professionalism, and the protection of sensitive information—a commitment that the City had frequently recognized and never before questioned.

80. Subsequently, at 3:14 p.m. on December 27, 2012, Walker emailed Cooper an attachment from the FBI's website regarding gang sophistication and gang infiltration of corrections, law enforcement, and government in various parts of the country. The attachment reported that gang members in at least 57 jurisdictions have applied for or gained employment within judicial, police or correctional agencies. Likewise, the attachment reported that gang members in at least 75 jurisdictions have compromised or corrupted judicial, law enforcement, or correctional staff within the past three years.

81. Nothing in the report implicated Summerson, her husband, the DRRMC or anyone in Arizona of any of the alleged conduct.

82. At 5:35 p.m. on December 27, 2012, Walker emailed Summerson a letter notifying her that the City was upholding the decision to terminate Summerson's

employment effective at 5:00 p.m. on December 28, 2012. Walker copied Kramer and Cooper on the letter.

83. In that letter, Walker stated that "My decision is supported by the fact that employees of the City's law enforcement, legal, dispatch, and court system are apprehensive in continuing their work relationship with the human resources/risk management department. The association with a documented OMG severely jeopardizes the security of confidential employee information and the safety of this large segment of our workforce. The loss of a close and trusting relationship with these employees is a significant disruption to the efficiency of the services human resources/risk management provides."

84. Kramer approved or ratified the termination of Summerson's employment and indicated his approval by signing the City's Personnel Action form on December 28, 2012.

85. The City violated its own written policies in terminating Summerson's employment.

86. Notably, the City's Personnel Action form related to the termination indicated that Summerson was eligible for rehire "with review."

87. The City's policies provide that the City Manager is the final policymaking authority on personnel matters.

88. According to the City of Kingman's Personnel Rules and Regulations, the City Manager is the policymaking authority in the formulation of personnel policies, to prescribe policies, and administer policies and procedures with the aim of facilitating personnel administration for the City departments.

89. According to the City of Kingman's Personnel Rules and Regulations, the City Manager will be ultimately responsible for maintaining the appropriate discipline among city employees and accomplishing such other personnel matters as deemed appropriate.

90. According to the City of Kingman's Personnel Rules and Regulations, the City has no desire to become involved in the personal lives of employees and employee personal relationships, whether involving other employees, family members, or other individuals, on their personal time and off City property are outside the City's area of responsibility.

91. According to the City of Kingman's Personnel Rules and Regulations, the City will become involved and take appropriate action only if a supervisor engages in a personal relationship with a subordinate or problems resulting from personal relationships manifest themselves on the job.

92. At 12:40 p.m. on December 28, Summerson requested a copy of the documentation that Walker had referenced in the pre-action hearing allegedly stating that the DRRMC were an outlaw motorcycle gang.

93. In response, Walker forwarded the email to Cooper asking for advice on how to respond to the request and indicating that she is only aware of A.R.S. § 13-105 and a memo from Officer Doughty to Lieutenant Chastain stating that the DRRMC are classified as an OMG in the state of Arizona.

94. At 2:49 p.m., Walker emailed herself a Press Release from the Arizona Department of Public Safety dated December 3, 2009 regarding the arrest and search warrants issued related to members of the Hell's Angels and two alleged DRRMC members, Clifford Ballentine and Snider.

95. On January 2, 2013, Cooper responded to the request and emailed Summerson a December 16, 2009 Information Report by a Detective Morris that Cooper asserted "indicates the illegal activities of the Desert Road Riders and its designation as gang per state statutes."

96. In the 2009 Information Report, Detective J.D. Morris asserted that "the Desert Road Riders MC was founded in 1993 as being dedicated to the well being of the biker community. Their goals were to promote safety, education and freedom for bikers

and their families. The Desert Road Riders MC achieved a non-profit status in and was incorporated in 2000."

97. In the 2009 Information Report, Detective Morris asserted that "In 2002 The Desert Road Riders MC voted to support the Hell's Angles [sic] MC . . . [and] The Desert Road Riders became a member to the Arizona Confederation of Motorcycle Clubs (ACMC)."

98. According to the ACMC Mission Statement on its website, "The ACMC is made up of Arizona Motorcycle Clubs and Organizations which have come together in unity to facilitate and broaden communication amongst its Members, within the riding community and general public. It serves to educate both riders and the non-riding public on all of the positive aspects of motorcycling and to warn against and oppose any intrusion(s) upon their rights to live and ride free. Its goals are to promote and protect motorcyclist's rights. It will accomplish these goals by any lawful means necessary. The ACMC does not approve organizations, or in our language 'sanction', Clubs. The ACMC Members are a select group of Elite Clubs and Organizations who have banded together in a fight for freedom and stand in defense of American rights, especially MC Clubs, and all Motorcyclists."

99. The ACMC's lawful efforts to promote and protect motorcyclists' rights, fight for freedom and stand in defense of American rights for motorcycle clubs and motorcyclists are protected expression under the First Amendment of the United States Constitution.

100. To the extent the DRRMC voted to support the Hells Angels MC, such an expression of support is protected speech under the First Amendment of the United States Constitution.

101. In the 2009 Information Report, Detective Morris claims that "From 2002 to Present the Desert Road Riders MC have [sic] pulled away from the original friendly relationship that was once established with Law enforcement and have taken on a 'One Percent Club' Mentality."

102. In the 2009 Information Report, Detective Morris alleges that in July 2008, DRRMC then-President Clifford Ballentine was arrested while wearing his DRRMC "Colors" and charged with two Felony drug charges.

103. In the 2009 Information Report, Detective Morris alleges that in June 2009 DRRMC then-President Ballentine and then-Sergeant at Arms Snider participated with members of the Hells Angels MC in a fight with the VAGOS MC, and that Ballentine, Snider and others were charged with Felony Crimes in connection with the fight.

104. Ballentine left the DRRMC in 2009 to join a One-Percent club.

105. By April 2012, all charges against Ballentine and Snider related to the alleged fight were dismissed by the prosecutor.

106. Based on the above events alleged in the 2009 Information Report, Detective Morris asserted that "the Desert Road Riders MC have met the criteria of a Criminal Street Gang as defined in ARS 13-105.8, therefore the Desert Road Riders MC will be documented as [a] Criminal Street Gang."

107. According to A.R.S. § 13-105.8, a "criminal street gang" is defined as "an ongoing formal or informal association of persons in which members or associates individually or collectively engage in the commission, attempted commission, facilitation or solicitation of any felony act and that has at least one individual who is a criminal street gang member."

108. In October 2009, the President of the Knights of the Patriot Motorcycle Club sent City Mayor John Salem an email forwarding a message from the Chair of the ACMC regarding a then-upcoming event in Kingman involving many bikers from many clubs. In the email to Salem, the individual stated that the event was being organized by the DRRMC for the purpose of trying to get the City to make wrong moves to file law suits against the City and many of its establishments that post a "no colors" policy.

109. To the extent the DRRMC engaged in lawful assembly for the purpose of protesting the "no colors" policy, such assembly and protest would be protected assembly/speech under the First Amendment.

110. On January 4, 2013, Walker emailed Semm regarding Summerson's termination, stating that "The reasons for termination is [sic] not gross negligence rather due to disruption and efficiency of services we provide."

**COUNT ONE**
**(Violation of Freedom of Association Under 42 U.S.C. § 1983)**

111. Summerson incorporates by reference all previous allegations as though set forth fully herein.

112. At all times, Defendant was acting under color of state law.

113. As described above, Summerson's association with her husband William Summerson was the sole reason and/or a substantial or motivating factor in Defendant's decision to terminate her employment.

114. Defendant violated Summerson's freedom of association under the First and Fourteenth Amendments to the United States Constitution by terminating Summerson's employment.

115. When Defendant terminated Summerson's employment based on her protected association with her husband, it did so pursuant to an official custom, practice or policy in that the decision was approved and/or ratified by Kramer, the City Manager and final policymaker for personnel decisions.

116. In engaging in the above conduct, Defendant violated 42 U.S.C. § 1983.

117. As a result of Defendant's conduct, Summerson has suffered and continues to suffer damages including lost income, lost retirement benefits, other lost benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life, all in an amount to be proven at trial.

**COUNT TWO**
**(Violation of Freedom of Association**
**Under 42 U.S.C. § 1983)**

118. Summerson incorporates by reference all previous allegations as though set forth fully herein.

119. At all times, Defendant was acting under color of state law.

120. As described above, Summerson's association with the DRRMC was the sole reason and/or a substantial or motivating factor in Defendant's decision to terminate her employment.

121. Defendant violated Summerson's freedom of association under the First and Fourteenth Amendments to the United States Constitution by terminating Summerson's employment.

122. When Defendant terminated Summerson's employment based on her protected association with the motorcycle club, it did so pursuant to an official custom, practice or policy in that the decision was approved and/or ratified by Kramer, the City Manager and final policymaker for personnel decisions.

123. In engaging in the above conduct, Defendant violated 42 U.S.C. § 1983.

124. As a result of Defendant's conduct, Summerson has suffered and continues to suffer damages including lost income, lost retirement benefits, other lost benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life, all in an amount to be proven at trial.

125. Summerson demands a jury trial on all claims and issues set forth herein.

WHEREFORE, Plaintiff Melissa Summerson prays for judgment against Defendant City of Kingman as follows:

A. For an award of economic damages in an amount sufficient to make Plaintiff whole for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendant' conduct;

B. For an award of other compensatory damages for mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation, loss of enjoyment of life and other losses incurred by Plaintiff as a result of Defendant' conduct;

C. For an award of attorneys' fees and related expenses;

D. For an award of prejudgment and post-judgment interest;

E. For an award of Plaintiff's costs of suit incurred herein; and

F. For an award of such other relief as the Court may deem just and proper.

DATED this 9th day of May, 2013.

ROBAINA & KRESIN PLLC

By /s/David C. Kresin
David C. Kresin
Attorneys for Plaintiff Melissa Summerson